UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| UNITED STATES OF AMERICA | No. 25 CR 637 |
|---|---|
| v. | Honorable Joan H. Lefkow |
| JUAN ESPINOZA MARTINEZ | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S
CONSOLIDATED MOTIONS IN LIMINE**

The United States of America, by its attorney, Andrew S. Boutros, United States Attorney for the Northern District of Illinois, respectfully responds to defendant's Consolidated Motions *In Limine* (Dkt. 75) as follows:

**I.  DEFENDANT'S MIL # 1: THE TERM "HIT" OR "BOUNTY" SHOULD NOT BE BARRED FROM TRIAL**

Defendant is charged with using interstate commerce facilities in the commission of murder-for-hire, in violation of 18 U.S.C. § 1958(a). He has moved *in limine* to bar use of the word "hit" or "bounty" at the upcoming trial. There is no reason to do so. Both terms can be used colloquially to refer to a murder-for-hire scheme or plot and are no more inflammatory than the words expressly used in the statute itself.

In his motion, defendant does not articulate how use of the words "hit" or "bounty" will prejudice him. Nor does he acknowledge that using the statutory language of "murder-for-hire" means the same as the words that he seeks to bar. All defendant has presented is his conclusory assertion that "hit" or "bounty" will inflame the jury and play on their emotions. That is not true given the nature of the charge at issue here.

The case defendant cites, *United States v. Frasch*, 818 F.2d 631, 634 (7th Cir. 1987), does not support his position. In that case, unlike this one, the word at issue was highly prejudicial because it was an offensive racial slur used by the defendant that was likely to inflame the passions of jurors. The Seventh Circuit in *Frasch* affirmed the district court's decision to *not* redact the highly offensive racial slur from recordings of defendant admitted into evidence. Nonetheless, the court offered two potential "suggestions" to mitigate the potential prejudice from highly offensive language. *Id.* at 634. First, the court noted that trial courts should carefully consider whether substitution or deletion of the "offensive words" would damage the probative value of the evidence. *Id.* Second, "when the offensive language has significant probative value, or when deletion or substitution would be impracticable, the trial court should question the venire panel, using the actual language that the jury will later hear." *Id.*

Nothing from *Frasch* applies here. "Hit" and "bounty" are not highly offensive, inflammatory, or prejudicial, and were not uttered by defendant. They constitute merely a colloquial way to describe the statutory charges. These are not words that relate to things such as racial or ethnic slurs likely to inflame the passions of jurors and prejudice the defendant.

Moreover, even under *Frasch*, use of the word "bounty" is relevant and impracticable to redact because it is included in portions of a video-recorded post-arrest interview of defendant that the government will seek to admit into evidence at trial. During that recording, law enforcement used the term "bounty" at least once in

questions that defendant answered. Given that the recording will be evidence in this case, and not easily subject to redaction, there is no basis to bar use of the term. The recording is relevant probative evidence, and there are no means by which that word in the recording can be substituted for a word that purports to be less inflammatory. Thus, based on the above, defendant's motion on this ground should be denied.

## II. DEFENDANT'S MIL # 3: SUBJECT TO REASONABLE TEMPORAL CONSTRAINTS, PHOTOGRAPHS OF WEAPONS FOUND ON DEFENDANT'S PHONE, ALONG WITH OTHER EVIDENCE PERTAINING TO FIREARMS, SHOULD NOT BE EXCLUDED

The government does not object to Defendant's MIL # 3, to the extent it seeks to exclude photographs of firearms, or other evidence related to defendant's access to firearms, that is temporally attenuated from the charged conduct. At trial, the government intends to introduce evidence that defendant had access to, or, was interested in acquiring, firearms, close in time to the Indictment period (October 3, 2025 to October 4, 2025). This evidence may include photographs of firearms obtained from defendant's cell phone, defendant's statements during his video-recorded post-arrest interview, messages exchanged via text message or social media discussing firearms, and testimony. The government does not intend to use such evidence that pre-dates October 1, 2025.

The government does intend to use such evidence, close in time to the charged conduct, that is relevant to the charged offense. The indictment charges that on or about October 3, 2025 until on or about October 4, 2025, defendant knowingly used a facility of interstate commerce with the intent that murder be committed. Dkt. 12. On or about October 3, 2025, defendant used Snapchat to send SOI-1 a photograph

depicting Gregory Bovino, a senior official in the United States Border Patrol ("USBP"). Immediately below the photograph, defendant transmitted the words "2k on info cuando lo agarren," which translates to "2k on information when you get him,"[1] "10k if you take him down," and "LK [followed by several emojis] on him." (preliminarily marked as GX 201).

On or about October 2, 2025, defendant sent substantially similar details over Snapchat to another user ("Snapchat User 1"). (preliminarily marked as GX 402). Defendant transmitted to Snapchat User 1 a photograph of Mr. Bovino, and wrote "10k for his head," "dead or alive," "shit serious." Defendant also wrote, partially in Spanish, "pa muchos no bit any infor de donde ande y lo agarren ya chigaste con at least 2-3k for info," which translates to "not for many bit [sic] any infor [sic] on his whereabouts and if captured you can fucking make at least 2-3k for info." Defendant further stated "they want to get him in the vill [Little Village]." The following day, on or about October 3, 2025, defendant transmitted to Snapchat User 1 a screenshot of another user's post. That post featured a photograph of a handgun with the caption, "Available 1500 discount price."

Defendant's purpose in sending this photograph is informed by the context of the messages sent the day before. A jury can readily infer that defendant was expressing his interest in purchasing a gun, or soliciting Snapchat User 1's interest in purchasing a gun, in furtherance of the bounty that defendant described. This photograph was also transmitted by defendant over Snapchat, alleged to be an

---

[1] The government's Spanish to English translations contained herein are preliminary, and not final.

interstate facility by the indictment. As a result, defendant's transmittal (via Snapchat) of a gun-for-sale on the day after he transmitted information about a murder-for-hire, to the very same person he previously transmitted the information to, speaks directly to whether defendant's use of Snapchat was useful to, or in furtherance of, the murder-for hire plot, which is something the government must prove. *United States v. Dvorkin*, 799 F.3d 867, 875; *United States v. Mandel*, 647 F.3d 710, 717; *United States v. Caguaga*, 884 F.3d 681, 687-88 (7th Cir. 2018); 18 U.S.C. § 1958(a). The transmittal of the gun-for-sale is also probative of whether defendant used Snapchat with the intent that murder be committed, another element that the government must prove.

For similar reasons, other evidence, whether from defendant's Snapchat account and phone (both alleged to be facilities of interstate commerce), defendant's admissions in his post-arrest interview, or other testimony, demonstrating that defendant had access to firearms, or was interesting in obtaining firearms, close in time to the incriminating communications is relevant. This evidence is additional proof that defendant used an interstate facility to store or obtain information regarding tools that could be used (either by him or others) in furtherance of the murder-for-hire plot. It is also additional proof that defendant was taking the bounty seriously, which proves his intent.

The probative value of this evidence is not substantially outweighed by its prejudicial effect. Photographs of firearms or statements about obtaining firearms, close in time to the charged conduct, are no more prejudicial than the defendant's

5

dissemination of a murder-for-hire. The government does not intend to needlessly associate this evidence with unrelated conduct and generalized gun-violence. Lastly, any risk of undue prejudice is mitigated by the temporal constraints that the government shall impose.

### III. DEFENDANT'S MILS # 6-8: CERTAIN EVIDENCE PERTAINING TO STREET GANGS SHOULD NOT BE BARRED AT TRIAL

Defendant moves to exclude evidence that defendant's home is in Latin King territory (Defendant's MIL # 6); that defendant is a Latin King (Defendant's MIL # 7); and that defendant's family member was a Latin King (Defendant's MIL # 8). Defendant cites Rule 401 and 403 as grounds for each of these motions. For Defendant's MIL #7, defendant cites Rule 404(a) and Rule 802 as additional grounds. For the reasons explained below, these motions should be denied.

*a. Overview of government's anticipated evidence pertaining to street gangs*

In this case, defendant's own words, typed alongside murder-for-hire information, reference street gangs. This places defendant's relationship to street gangs, particularly to the Latin Kings, squarely at issue. Defendant transmitted key details of a murder-for-hire plot to SOI-1 through Snapchat. *see* GX 201. This included a photograph of Mr. Bovino, the reward for information leading to his capture ($2000), and the reward for murdering him ($10,000). *Id.* In the same breath, defendant also wrote "LK [emojis] on him." *Id.* As reproduced in the photograph depicted below, the

6

"LK" (for Latin Kings) was followed by three emojis depicting the "rock on" hand symbol, which closely resembles a hand symbol used by the Latin Kings.[2] *Id.*



Defendant's text messages with other individuals, close in time to October 3, 2025, also reference street gangs. During defendant's post-arrest interview, investigators showed defendant his text messages exchanged on or about October 4, 2025 with a contact named "cody." (preliminarily marked as GX 303). In those messages, defendant stated "my guys are ready in the vill [Little Village]," "saints, sds, and 2six being bitches,"[3] "they haven't teken non [sic.] from the vill," "n they won't," "Kings on they ass n theu [sic.] scared," Defendant sent these messages shortly after sending cody a photograph of Mr. Bovino. (preliminarily marked as GX 301). Here, defendant is indicating that "my guys" are ready to mobilize against immigration officers. In addition, defendant boasts that the Latin Kings have successfully defended Little Village where other street gangs have failed. Defendant telling cody "Kings on they ass," parallels him telling SOI-1 "LK on him."

Defendant's written words also parallel what he told investigators about his familiarity with the Latin Kings. During his post-arrest interview, defendant

---

[2] To create the "rock on" hand symbol, the ring finger, middle finger and thumb join together over the palm, while the index finger and pinky remain extended. To create the Latin Kings gang symbol, the ring finger and middle finger are curled over the palm while the index finger, pinky finger, and thumb all remain extended.

[3] These are references to various street gangs in Chicago.

7

acknowledged, among other things, that he has lived for 30 years in a neighborhood occupied by the "Kings," his cousin was a Latin King, he knows members of the Latin Kings, Latin Kings know and respect him, he was familiar with the leadership structure of the Latin Kings, and that the Latin Kings were capable of violence.

When asked how he knew "LK was on him," as defendant wrote to SOI-1 in reference to Mr. Bovino, defendant responded "because I hear the talks," indicating that defendant was within earshot of in-person Latin Kings meetings discussing the plot. GX 201. Defendant even made multiple gang symbols with his hands during the post-arrest interview. More specifically, after reviewing his Snapchat communications with SOI-1, defendant implied that the "rock on" emojis looked like a hand symbol used by the Latin Kings, even demonstrating the latter with his hands. *Id.*

The government also anticipates that SOI-1 may testify, among other things, that (i) defendant told SOI-1 that defendant was a member of the Latin Kings; (ii) SOI-1 knew defendant lived in the Little Village neighborhood, where the Latin Kings have a presence; (iii) defendant sent to SOI-1 photographs of defendant with other gang members; (iv) defendant introduced SOI-1 to people whom defendant identified as Latin King members, and (v) on at least one occasion, defendant told SOI-1 that it was "safe" for SOI-1 to come into defendant's neighborhood.

### b. *The government's anticipated evidence pertaining to street gangs is highly relevant and not unduly prejudicial*

Defendant referenced the Latin Kings, using words and symbols, as he transmitted the key details of the murder-for-hire plot to SOI-1. This begs the

8

question: what was defendant's intent in sending these words, photographs, and symbols? That, the government anticipates, will be a disputed fact at trial. What defendant meant by his references to the Latin Kings, as it pertains to the murder-for-hire plot, is plainly relevant to this central issue. The more that those words mirror defendant's reality, the more likely it is that defendant intended those words to shape reality. Therefore, evidence of defendant's proximity to the Latin Kings (to any degree), his relationship (in any form) to other Latin Kings, and his familiarity with Latin Kings symbols, factions, lore, structure, and territory, help the jury determine whether defendant's words carried truth, significance, and credibility. In other words, defendant's real-life affinity to words he typed lends intent behind those words. The proof of that affinity is therefore probative of whether defendant knowingly used a facility of interstate commerce with the intent that murder be committed.

The probative value of this evidence is not substantially outweighed by the danger of unfair prejudice. Defendant references the Latin Kings in his own words whilst disseminating highly incriminating details of a murder-for-hire plot. Information about his familiarity with, or associations to, the Latin Kings informs defendant's highly incriminating statements and is no more prejudicial than those statements on their own.

For those reasons, evidence that defendant lived in Latin Kings territory, evidence that tends to prove defendant's affiliation with the Latin Kings, and

evidence that defendant's family member was a Latin King, are not excludable under Rule 401 or 403.

### c. *Evidence of defendant's affiliation or familiarity with the Latin Kings is not inadmissible under Rule 404(a)*

Evidence of defendant's familiarity with the Latin King's members, symbols, territory, structure, and lore is direct evidence of the crime charged. It is evidence that defendant intended a murder be committed when he sent SOI-1 the pertinent details of a murder-for-hire plot which included a reference to the Latin Kings. For similar reasons, the evidence is being offered for a non-propensity purpose: intent. More specifically, defendant's affiliation with the Latin Kings (whether or not the evidence convinces a jury he was an actual member) informs whether the information he was providing was real and whether he intended that information to have real life consequence. Accordingly, such evidence is not excludable under Rule 404(a).

### d. *The government's anticipated evidence is not inadmissible hearsay*

The government's above-described evidence is not inadmissible under Rule 802. Defendants own statements from text messages or his post-arrest interview are statements by a party opponent and are not hearsay. Fed. R. Evid. 801(d)(2). As to the anticipated testimony from SOI-1, none of the evidence described above is inadmissible hearsay. Rather, it is either a statement by party opponent, rationally based on SOI-1's perception, or matters of which SOI-1 has personal knowledge. Fed. R. Evid. 602; 701; 801(d)(2).

## IV. DEFENDANT'S MIL # 10: THERE IS NO NEED TO EXCLUDE WITNESSES FROM TESTIFYING TO OR MAKING ASSUMPTIONS

Defendant seeks an order from this Court barring any witnesses from testifying about assumptions, speculation, or testimony that would call for a hearsay response. No such order is needed. Counsel for the government are aware of the Federal Rules of Evidence and have no intention of asking questions seeking answers that are inadmissible assumptions, speculation, or hearsay. To the extent that government counsel does so at trial, defense counsel will be present to object as needed. There is no need for a vague order barring questions and answers that are already prohibited under the Federal Rules of Evidence. The Court can address these issues as needed at trial.

It appears that what defendant seeks to bar through this motion is expected testimony from SOI-1, the recipient of the murder-for-hire message that defendant sent. The government expects that witness to testify that he believed the communication defendant sent to him was a real solicitation to murder a government official in exchange for money. The witness reached out to law enforcement shortly after receiving the communication from defendant.

Though defendant claims that such testimony would be an assumption, speculation, or hearsay, it would be none of those things. Instead, the testimony would constitute the witness's honest belief that defendant was seeking to solicit him to engage in murder-for-hire based on the nature of the communication, the context in which the communication was received, and the witness's background, history, and relationship with defendant. Such testimony is plainly relevant under Rule 401

because, without question, it has a tendency to make a fact more or less probable than it would be without the evidence. Indeed, in the analogous threat context, the victim's response to a threat is among the broad array of contextual evidence that is relevant and admissible. *See, e.g.*, *United States v. Parr*, 545 F.3d 491, 498 (7th Cir. 2008) (noting that "our circuit treats as relevant evidence both the victim's response to a statement and the victim's belief that it was a threat . . . ."); *United States v. Schneider,* 910 F.2d 1569, 1570-71 (7th Cir. 1990) ("The fact that the victim acts as if he believed the threat is evidence that he did believe it, and the fact that he believed it is evidence that it could reasonably be believed and therefore that it is a threat.")

Moreover, the probative value of this testimony is not substantially outweighed by the danger of unfair prejudice under Rule 403. Defendant does not set forth how this testimony will unfairly prejudice him. This is highly probative evidence that is not unfairly prejudicial. The evidence does not suggest a decision based on an improper or emotional basis.

Finally, to the extent that defendant views this testimony as containing an opinion, it is admissible under Federal Rule of Evidence 704. Defendant appears to concede as much in his motion.

Thus, because defendant has failed to articulate a theory as to why this testimony is inadmissible, or cite a case saying as much, his motion on this ground should be denied.

### V. DEFENDNAT'S MIL # 11: SEQUESTRATION OF WITNESSES

The government does not object to excluding trial witnesses under Federal Rule of Evidence 615 granted that the government's two case agents be allowed to

remain in the courtroom and sit at counsel's table during the trial. The government expects that both agents will testify at trial. One agent is expected to authenticate a recording of a post-arrest interview with defendant. The other agent will testify regarding Snapchat messages seized after a review of defendant's Snapchat account. The agents' presence at the trial is contemplated by Rule 615, specifically, Rules 615(2) and (3), and customary in this district. The government does not object to the exclusion of any other witness who will testify at trial.

## VI. DEFENDANT'S MILS # 2, 4-5, 9

At trial, the government does not intend to introduce any evidence of: (1) defendant's narcotics use; (2) police contact with defendant's family home; (3) contact between the Department of Children and Family Services ("DCFS") and defendant's family; (4) or calls to SOI-1 from alleged Latin Kings after defendant's arrest. Therefore, the government does not object to the exclusion such evidence

## **CONCLUSION**

For the reasons stated above, the government respectfully requests the Court deny defendant's Consolidated Motions *in Limine*.

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

By: *s/Minje Shin*
Minje Shin
Jason Yonan
Assistant United States Attorneys
United States Attorney's Office
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-5300